The SIXTY–FIVE SECURITY PLAN, et ano., Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF GREATER NEW YORK, a Corporation, Defendant.

No. 80 Civ. 7100 (WK).

United States District Court, S.D. New York.

March 28, 1984.

Eisner & Levy, P.C. by Richard Levy, New York City, for plaintiffs.

Blue Cross and Blue Shield of Greater New York by Ellen Barrett Levin, New York City, for defendant.

## MEMORANDUM & ORDER

KNAPP, District Judge.

### BACKGROUND

The Sixty-Five Security Plan ("Security Plan") is a program, established pursuant to the Labor Management Relations ("Taft-Hartley") Act, 29 U.S.C. § 186,[1] to provide health and welfare benefits to members of District 65, United Automotive Workers, AFL–CIO.[2] In 1975, Security Plan entered into an agreement with Blue Cross and Blue Shield of Greater New York ("Blue Cross"). The precise nature of this agreement is disputed by the parties: Blue Cross contends that it is embodied in the written contracts which the parties signed every year until 1980; while Security Plan insists that Blue Cross assured it that these written contracts were formalities to which no attention would be paid, and relies instead upon the oral and written agreements ("the oral agreements")[3] which preceded the signing of the first contract.

Under either the written or the oral agreements, Blue Cross was to assume responsibility for various aspects of the health care program previously administered by Security Plan. Blue Cross's duties included: reviewing claims submitted to it and, where it deemed appropriate, granting them; reviewing and judging the propriety of the length of participants' hospital stays; negotiating reimbursement rates with participating hospitals; and instituting and maintaining administrative systems, including computer programs, for the administration of the program. Security Plan agreed to pay Blue Cross a percentage of all claims granted by it. Security Plan reserved the right to review Blue Cross's performance and to hear appeals on any claims denied by Blue Cross. Security Plan paid sums of money to Blue Cross on a regular basis, which Blue Cross was to apply to the payment of claims and to its own fees, returning the rest.[4]

On December 15, 1980, Blue Cross and Security Plan simultaneously instituted actions against each other. Blue Cross's complaint, filed in the Supreme Court of the State of New York, alleged that Security Plan had breached the written contracts

---

1. Unless otherwise noted, all statutory references in this Opinion are to various sections of Title 29 of the United States Code.

2. A few participants in Security Plan's health plan are not members of Local 65; however, this is not relevant to the action or the motion before us.

3. As we have stated, these alleged "oral agreements" included both oral and written correspondence. The term "oral agreements" is used here simply to distinguish these agreements from the written contracts upon which Blue Cross relies.

4. The precise amount and computation of these liabilities are disputed by the parties.

by failing to pay to Blue Cross the fees set forth therein. Security Plan's action was commenced in this Court under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, which provides for federal jurisdiction of any action instituted by a participant, beneficiary or fiduciary of an employee benefit plan, to redress or enjoin any violation of that statute's substantive provisions. Security Plan asserted in its complaint that Blue Cross was a fiduciary, as defined by ERISA, with respect to its relationship to the health care plan, and that it had violated both its fiduciary duties under that statute and the oral agreements between the parties. In addition, Security Plan asserted that Blue Cross had made various fraudulent representations as to its capabilities and future actions on Security Plan's behalf. Blue Cross counterclaimed with essentially the same allegations raised by it in its State Court complaint; Security Plan similarly counterclaimed in the State action.

Upon application by Security Plan by notice of removal dated January 14, 1981, Blue Cross's action was removed to this court. By our Order of May 14, 1981 the two cases were consolidated.

Blue Cross has now moved for summary judgment on both its claim and counterclaim, and for dismissal of Security Plan's claims and counterclaims.[5] Alternatively, Blue Cross has moved to strike Security Plan's demand for a trial by jury on its ERISA claims; and to strike a claim by Security Plan that Blue Cross's "rate of retention," or fee on claims paid, constituted an impermissible inherent conflict of interest under ERISA.

## SUBJECT MATTER JURISDICTION

### 1. Security Plan's Status as "Participant"

■ Initially, we note that the recent opinion by the Court of Appeals in *Pressroom Unions—Printers League Income*

*Security Fund v. Continental Assurance Co.* (2d Cir.1983) 700 F.2d 889, decided after we heard oral argument on the instant motion, has altered our view of Security Plan's complaint. In *Pressroom Unions,* the Court of Appeals held that ERISA provided it with no subject-matter jurisdiction over the complaint of a pension fund. The parties agree that the complaint of Security Plan is in no way distinguishable from that of the pension plan in *Pressroom Unions,* and we therefore find that we have no jurisdiction over it. The complaint of Security Plan is accordingly dismissed.

■ We find, however, that this action is properly before us on the complaint of David Livingston, Director of Security Plan and a beneficiary of and participant in it. Section 1132(e)(1) provides in pertinent part that "the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by ... a participant, beneficiary, or fiduciary." Although Livingston asserts no individual cause of action, this is perfectly consistent with ERISA. Section 1132(a) sets forth, in the alternative, several forms of relief which may be sought by a beneficiary or participant, among them that a fiduciary in breach of its obligations

> be [held] personally liable to make good to [a] *plan* any losses to the *plan* resulting from each ... breach, and to restore to such *plan* any profits of such fiduciary which have been made through use of assets of the *plan* by the fiduciary.

Section 1109(a) (emphasis supplied).

ERISA thus provides in no uncertain terms that an individual beneficiary of or participant in a plan need not allege any direct personal damage, or seek to enforce personal rights, in order to invoke "ERISA jurisdiction" under § 1132(a). Contrary to Blue Cross's contention, this is not belied by *Pressroom Unions, supra.* Although the Court there denied a motion to substitute certain participants in a pension fund

---

**5.** Blue Cross had in addition moved, in the alternative, for a dismissal of Security Plan's action on grounds of subject-matter jurisdiction,

and for a remand of its own action to state court. However, this motion was withdrawn by it at oral argument.

as plaintiffs in the stead of the fund, it did so on the following rationale:

> "[I]f jurisdiction is lacking at the commencement of [a] suit, it cannot be aided by the intervention of a [plaintiff] with a sufficient claim." [Citations omitted.] ... In this case the Fund seeks not to remedy inadequate jurisdiction allegations, but rather to substitute a new action over which there is jurisdiction for one where it did not exist.... Moreover, the *Rheingold* opinion [*Rheingold Breweries Pension Plan v. Pepsico, Inc.* (S.D. N.Y.1981) 2 Empl.Ben.Case. 2406], filed before the Fund's suit was commenced, should have put the Fund in this case on notice that it would have difficulty in pressing its claims under its own name.... If the Fund was aware of [the *Rheingold* ] ruling, it has advanced no reason for its original failure to name alternative plaintiffs in the event that [it was not allowed] to sue in its own name.

700 F.2d at 893–894.

The instant action, by contrast, has from its inception included such an "alternative plaintiff" in the person of Livingston. Although the Court of Appeals did not address the issue directly (not being required to do so), it seems to us that the Court would not have given the quoted reason for declining to permit the addition of a new plaintiff unless it believed that such plaintiff would otherwise have been entitled to press a claim on behalf of the Fund.[6]

## 2. Blue Cross's Status as "Fiduciary"

We turn now to a second, more complex, challenge to our subject-matter jurisdiction. Blue Cross contends that it was not a "fiduciary" of the health care plan as that term is defined by ERISA and had no fidu-

ciary duties under that statute; hence, it contends, any claim on Security Plan's behalf cannot be based upon an alleged violation of any provision of ERISA, but at most states a cause of action for breach of contract over which we have no jurisdiction.

Section 1002(21)(A) states that a person or entity is a fiduciary with respect to an employee benefit plan to the extent that:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets * * * (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

We note that the Court of Appeals for this Circuit has not considered the application of this provision to a question like the one before us. However, the guidance of various District Court decisions, combined with our analysis of the evidence before us, convinces us that the duties which Security Plan delegated to Blue Cross demonstrate that Blue Cross fulfills both of these statutory criteria.

### Discretionary Control Over the Plan's Assets

■ We note preliminarily that, since Blue Cross made all payments of claims from a fund set up by Security Plan, the assets at issue under either the written or oral agreement were indeed those of Security Plan.[7] Blue Cross was not, as it claims, a mere insurer. The situation at bar is, in this respect, quite dissimilar from that presented by what we consider to be the more usual Blue Cross arrangement. In other situations—for example, the health

---

**6.** We had requested that the parties brief the issue, reserved in *Pressroom Unions,* of whether, in the absence of "ERISA jurisdiction," 28 U.S.C. § 1331 provides subject-matter jurisdiction for claims asserted in Security Plan's own name. However, since we find that we have jurisdiction over Livingston's claims, which Blue Cross admits are identical to those asserted by Security Plan, we need not decide that question.

**7.** Blue Cross relies on the fact that under the written contracts it, and not Security Plan, was required to pay for all approved claims once the total cost of all claims paid by it exceeded a certain figure. Even assuming that the written contracts are binding, this provision seems to us of little importance in light of the admission of Blue Cross's Vice President Joseph R. Kelly that this cut-off point was intended to be "a number which would never be reached." Kelly Deposition at 54–55; Security Plan Exhibit "R."

care plan subscribed to by the Federal Government under which many court employees in this District are covered—Blue Cross contracts to make payments out of its own funds in consideration of the premium the Government and its employees pay to Blue Cross. Under its agreements with Security Plan, on the other hand, Blue Cross never advanced any of its own money, but simply paid out of Security Plan's monies, and earned a fee for doing so.[8]

We therefore find that Security Plan intended to, and indeed did, turn over to Blue Cross the "management and disposition" of its assets. Such disposition, of course, took the primary form of payments made to subscribers. Under either the oral or the written agreement, Security Plan unequivocally yielded to Blue Cross the right and power to make such payments. Indeed, the letter of February 20, 1976 from Blue Cross's Vice-President Joseph R. Kelly to Security Plan Director Esther Levitt explicitly states that although, in Kelly's opinion, "Blue Cross and Blue Shield of Greater New York is an 'insurance carrier' for purposes of ERISA, not a fiduciary ... [t]he one exception is the Claims Processing and Review Procedure." Security Plan Exhibit "S." The discretion to grant or deny claims, without more, has been held sufficient to support a finding of fiduciary status. *See, e.g., Eaton v. D'Amato* (D.D. C.1980) 581 F.Supp. 743, 291 B.P.R. D–11; *Eversole v. Metropolitan Life Ins. Co., Inc.* (C.D.Cal.1980) 500 F.Supp. 1162, 1165; *Robbins v. First American Bank of Virginia* (N.D.Ill.E.D.1981) 514 F.Supp. 1183, 1190 ("[an entity] with authority to grant or deny claims ... has the type of discre-

tion and responsibility contemplated by the Act" (citing *Eversole* )).

The importance of Blue Cross's ability to determine which of the many claims submitted to it should be paid—especially where such a determination necessitated a decision on the appropriateness of hospital stays—is fully recognized and admitted by Blue Cross. For example, Kelly testified at his deposition that "[t]he length of stay is the major issue from the standpoint of the total cost of a particular case.... It is the big factor. I can't think of anything else which would have a serious impact, unless it is an admission which is not covered under the contract..." Kelly Deposition at 102; Security Plan Exhibit "V." Kelly further admitted that Blue Cross "exercised its discretion" in assessing the reasonableness of the length of hospital stays. Such "discretion" is, of course, precisely what defines a fiduciary under ERISA.

The procedure established by Blue Cross for reviewing the length of hospital stay is especially indicative of the extent to which it took over the management of the health care plan and its assets. Under this procedure,

> [t]here are three levels of review. The first is a desk review by a clerical person.... In unusual cases, it goes up to a nurse, who then starts reviewing to see if there is any reason why a longer stay is justified, and then if it becomes a real questionable one, it is put to a medical staff .... an individual doctor who is right on the staff, a full-time employee ... [o]f Blue Cross.... His determination is final.

---

8. This case is thus not controlled by *Cate v. Blue Cross & Blue Shield of Alabama* (E.D.Tenn.N.D. 1977) 434 F.Supp. 1187, upon which Blue Cross relies (and which, we note, is the only case revealed either by our own research or that of the parties to involve that entity). In *Cate,* Blue Cross had entered into an insurance contract, under which it was "contractually bound to offer reimbursement of medical expenses," 434 F.Supp. at 1188, 1189. The Court held that to find fiduciary status would be to "make every dissatisfied claimant under an employer's group health insurance plan a potential litigant in fed-

eral court," 434 F.Supp. at 1190, a result which it found—and we agree—could not have been the purpose of the Congress in enacting ERISA. Since we find that the agreement before us was not an "insurance contract," despite the fact that Blue Cross is commonly known as an insurance company, we need fear no such result. To the extent that *Cate* holds that no insurance company may ever be a fiduciary under ERISA because the Congress was not concerned with the financial stability of major insurance companies, we find no support for this conclusion and decline to follow it.

Kelly Deposition at 101–102; Security Plan Exhibit "V."

Blue Cross makes much of the fact that it did not technically have ultimate authority on its review of claims, since Security Plan retained final appellate jurisdiction. However, appeal could only be taken upon a *denied* claim; Security Plan could take no appeal from Blue Cross's decision to *grant* a claim. Security Plan and Blue Cross thus must have contemplated that Blue Cross would as a practical matter have the power to make the final decisions.[9]

Blue Cross asserts, however, that it is only an insurance company and as such cannot be a fiduciary unless it has the "responsibility for reviewing *denied* claims," *Austin v. General American Life Ins. Co.* (N.D.Ala.S.D.1980) 498 F.Supp. 844, 846 (emphasis in original). We do not find *Austin* dispositive. The Court in that case referred to 29 C.F.R. § 2560.-5021(g)(2), which provides that an ERISA plan may specify that an insurance company will be responsible for review of denied claims, in which case it will be a fiduciary. However, the Court did not rely exclusively upon this provision, but rather held that

the status of an insurer as a fiduciary is not automatic but rather turns upon the provisions of the plan and of the agreement made by the insurer.

The defendants present no evidence to the effect that (the insurance company defendant) is charged with review of denied claims *or is otherwise accountable as a fiduciary under ERISA.*

498 F.Supp. at 846 (emphasis supplied). The ability to review denied claims is therefore not required, but only one alternative. Indeed, this form of authority was not even mentioned in *Eversole v. Metropolitan Life Ins. Co., Inc., supra,* in which the Court based its finding of fiduciary status upon the fact that the insurance company defendant "ha[d] the authority to grant or deny claims." Likewise, in *Eaton v. D'Amato, supra,* the Court found it sufficient that the defendant

adjudicated varied and substantial medical claims for reimbursement in which its judgment as to what charges or amounts were "fair," "reasonable," or "customary" was *in effect final.*

291 B.P.R. at D–13 (emphasis supplied). Looking at the agreement between the parties, as *Austin* bids us do, we conclude that the discretion granted to Blue Cross made its decisions, too, "in effect final." We think that this is more than enough to satisfy the statutory definition of fiduciary.

Blue Cross places great weight upon the fact that its discretion was somewhat bounded by the terms of its contract with Security Plan. In particular, Blue Cross asserts that its discretion to grant or deny claims was circumscribed by the fact that Security Plan determined the classes of claims which might or might not be granted (for example, no payments were supposed to be made on claims for well-baby care). We think these limitations to be of little moment. We are aware of no authority for the implicit proposition that a fiduciary must have unlimited discretion. Indeed, such a contention is directly belied by the statute itself, which provides that a person is a fiduciary "to the extent … he exercises *any* discretionary authority or

---

9. Security Plan now asserts that Blue Cross misused this discretionary control by granting virtually all claims presented to it, including claims for services not covered by the agreements (*e.g.,* well-baby care). Security Plan claims that its nominal appellate function was further frustrated by the fact that, in those few instances where Blue Cross denied payment, it failed to provide Security Plan with sufficient information for it to render a *de novo* decision. We are not entirely convinced that an entity such as Blue Cross may be held a fiduciary solely through the alleged violation of the pow- ers granted to it. However, we need not decide this question, since in the instant case, in addition to these alleged unintended effects, Security Plan intentionally granted to Blue Cross the discretion to take the final step on all claims properly presented to it, and must have anticipated that Blue Cross would indeed take that step by granting at least some of those claims. In short, then, Security Plan and Blue Cross contemplated that with respect to at least some of the claims presented to Blue Cross, Security Plan would have no power of review.

discretionary control respecting management of such plan or exercises *any* authority or control respecting management or disposition of its assets." Section 1002(21)(A)(i) (emphasis supplied). Blue Cross's position would, further, emasculate the provision of Section 1105(c)(1) that "the instrument under which a plan is maintained may expressly provide for procedures" for the allocation of fiduciary responsibilities among persons either named or not named as fiduciaries. This section implies that not all discretionary functions must be held by any one fiduciary, and that fiduciaries may have sub-fiduciaries responsible to them, as Blue Cross was responsible to Security Plan. The proper test, we think, requires inspection of the responsibilities granted to an entity, not those withheld. As we have said, such inspection convinces us that Blue Cross was indeed a fiduciary.

### Authority and Responsibility in Administration of the Plan

With respect to the management of the health care plan, both parties seem similarly to have contemplated that Security Plan should hand over the reins to Blue Cross. As Security Plan Director Levitt stated in her affidavit (at p. 27):

> Probably the major reason the Plan entered its agreement with Blue Cross was Blue Cross' assurance that we would be able to take advantage of Blue Cross' power to obtain lower per-diem hospital rates with many more hospitals than we had obtained.

The drafters of ERISA explicitly recognized that such professed abilities might be an indicium of an entity's fiduciary status:

> [I]t must be recognized that there will be situations where ... consultants and advisors may because of their special expertise, in effect, be exercising discretionary authority or control with respect to management or administration of such plan or some authority regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

H.R.Rep. No. 1280, 93 Cong., 2nd Sess. 323 (1974). U.S.Code Cong. & Admin.News 5038, 5103, *cited* in *Brink v. DaLesio* (D.Md.1980) 496 F.Supp. 1350, 1355, *rev'd on other grds.* (4th Cir.1981) 667 F.2d 420, 2 EBC 2057.

Blue Cross does not deny that it urged Security Plan to rely upon its expertise, or indeed that Security Plan did so. Rather, it argues that it had only limited discretion in negotiating hospital rates since it is subject to State regulations and its negotiated hospital rates are subject to State agency approval. We reiterate, however, that ERISA does not require that an entity have *total* discretionary powers before it may be considered a fiduciary. The fact that the State may set limits upon the rates which Blue Cross and the hospitals could negotiate does not detract in the slightest from the facts that discretionary authority was required in these negotiations, that these rates were a crucial part of the administration of the health care plan, and that this discretion and administrative responsibility were turned over entirely to Blue Cross.

Security Plan also turned over to Blue Cross the responsibility of designing and implementing its own procedures for administering the day-to-day aspects of its claims review procedures. Blue Cross designed and implemented both manual and computer information and claims processing systems, through which it had almost total control over all the information pertinent to the health care program. Blue Cross insists that such recordkeeping activity is purely ministerial. We disagree. ERISA's definition of a fiduciary specifically includes responsibilities for "administration," which of necessity generally involves some ordinary, day-to-day activities. The proper focus is not on the activity, but on the role played by the entity. Where an entity, such as Blue Cross, has "broad latitude in ... performing ... administrative tasks," *Eaton v. D'Amato, supra,* 291 B.P.R. at D–11, we think this is enough. In *Eaton,* fiduciary status was found where the defendants "effectively super-

vised the establishment of recordkeeping systems used in administering the various benefit plans, and took some initiative regarding subsequent conversion to more sophisticated data processing equipment," 291 B.P.R. at D–13. Blue Cross exercised even more discretion than this: not only did it take "some initiative," it took complete responsibility for designing, implementing, and administering the system. Any improvements were made by it alone. As far as we can determine, although Blue Cross advised Security Plan of at least some of its activities in this respect,[10] Security Plan retained no control or discretion.

In sum, then, we find that the duties granted to and exercised by Blue Cross make it a fiduciary with respect to Security Plan and its health care plan, and that we thus have "ERISA jurisdiction" over this action. We therefore decline to dismiss Security Plan's ERISA claims.

### CONFLICT OF INTEREST

█ Blue Cross contends that Security Plan has failed to support its contention that Blue Cross's fees, and the manner of their computation, present a conflict of interest impermissible for a fiduciary under ERISA. We disagree. The parties appear to agree that the crux of this issue is whether these fee arrangements yielded Blue Cross "no more than reasonable compensation" for its services. Section 1108(b)(2). Blue Cross has not convinced us that its fees were not "more than reasonable."

Simply put, Security Plan obligated itself to pay Blue Cross a certain percentage of all claims paid. Blue Cross insists that this percentage was reasonable, adverting to industry standards, and refutes Security Plan's contention that such an arrangement was not what it had bargained for. Even if true, this is, we think, irrelevant.

The basic fact is that the more of Security Plan's money Blue Cross expended on payment of claims, the more it was rewarded. This does indeed appear to us to present a conflict of interest for Blue Cross, since as a fiduciary its incentive should have been to save Security Plan money, not to overspend it.

If, as Blue Cross contends, Security Plan has hitherto failed to specify how it contends it has been harmed by this inherent conflict, it has done so now in its detailed allegations that Blue Cross improperly paid numerous claims not allowed under the agreements. As to at least the percentage of these claims paid to Blue Cross as fees, we find that Security Plan has stated a coherent claim of actual abuse of Blue Cross's fiduciary powers.

We are unimpressed by Blue Cross's advertence to various provisions of ERISA which exempt from that statute's "prohibited transaction rules" certain situations which carry the potential for conflict of interest. Blue Cross does not, and cannot, contend that any of these exemptions applies to it. We do not understand the mere existence of some exemptions to signify that the Congress intended that vigilance as to potential abuses of fiduciary power be relaxed. ERISA is an extensive and detailed statute, and we are convinced that, had the Congress wished to permit a situation such as that before us, it could and would have so indicated. In the absence of such indication, we decline to strike the Security Plan's complaint in this regard.[11]

### MOTION TO STRIKE JURY DEMAND

Blue Cross has moved to strike Security Plan's demand for a trial by jury of its ERISA claims. As both parties acknowledge, the right to a jury trial of ERISA claims is by no means settled. Since the statute itself makes no provision in this

---

10. See, e.g., Security Plan Exhibits "E," "N," and "O."

11. We are, however, struck by Blue Cross's argument that at no time during the tenure of the agreements did Security Plan either protest, or request a revision of, the fee provision. While

we do not understand Blue Cross to raise a defense of laches, and so make no such ruling, we are puzzled as to why an agreement so obviously against Security Plan's interest was not earlier noticed and corrected.

regard, we must look to the nature of the claims asserted: if they are more closely analogous to legal than to equitable claims, a jury may be had; if the opposite, it may not. *Pollock v. Castrovinci* (S.D.N.Y.1979) 476 F.Supp. 606, 608.[12]

In this particular case such analysis is not easily performed. Security Plan has predicated jurisdiction, as we have noted, on §§ 1132(a)(3) and (e)(1), which govern suits seeking injunctive or other equitable relief. However, Security Plan here seeks compensatory damages for Blue Cross's alleged breaches of fiduciary duty, a claim analogous to a legal cause of action for which a jury might be demanded. Indeed, as Security Plan points out, specific performance and other standard forms of equitable relief would be inappropriate here, since any relationship between the parties (other than that engendered by this lawsuit) has ceased to exist.

■ Blue Cross relies on *Pollock v. Castrovinci, supra,* for its contention that since no damages may be assessed against it on the ERISA claims unless and until a determination be made that it did in fact breach its fiduciary duties, the primary determination which must be made is equitable and not legal. *Pollock,* however, presented a very different situation, in that *two* preliminary findings had to be made before the plaintiff's claim for damages could be considered: first, whether or not the defendants' actions violated various provisions of ERISA; and, if so, whether or not plaintiff was entitled to the equitable relief of a reformation of the fiduciary agreement between it and the defendants. Only if both determinations were made in

plaintiff's favor, and equitable relief granted, could the trier of fact proceed to address the issue of what damages—if any— would be due under the re-formed agreement. In the instant action, on the other hand, we need not award any equitable relief in order to award monetary damages. Only one preliminary finding need be made: whether or not Blue Cross breached its fiduciary duty. This in and of itself is not an equitable, as opposed to a legal, determination, and it does not seem to us to be sufficient to transform into an equitable action what otherwise bears all the indicia of an action at law.[13]

■ However, we need not now make a final determination on this issue. Security Plan has demanded a jury on its pendent claims, its entitlement to which is not challenged by Blue Cross. The same evidence will apparently be presented as to these and the ERISA claims. Determination by a jury of the latter, as well as the former, will thus not unduly prolong the length of the trial. The most expedient course of action therefore seems to us, to allow the ERISA claims to be presented to the jury, and in addition to make our own independent findings of fact. Under this procedure, we shall need to make a final determination on this motion if, and only if, we find for Blue Cross and the jury finds for Security Plan on the ERISA claims.[14] We therefore deny the motion to strike the jury demand, with leave to Blue Cross to renew it in the event that the above-described scenario should be realized.

### BREACH OF CONTRACT
Blue Cross has moved for summary judgment on its claim that Security Plan

---

**12.** We are aware that other decisions have held that actions brought under 29 U.S.C. § 1132(a)(3) never carry with them entitlement to trial by jury, while actions brought under 29 U.S.C. § 1132(a)(1)(B), are so entitled. *Stamps v. Michigan Teamsters Joint Council No. 43* (E.D. Mich.1977) 431 F.Supp. 745; *Bouton v. Central States, Southeast and Southwest Areas Pension Fund* (E.D.Tenn.1978) BNA Pens.Rep. No. 226, D-1. However, we are aware of no cases in this Circuit which have relied upon such reasoning; and we, like the Court in *Pollock v. Castrovinci, supra,* do not follow it.

**13.** *Dasho v. Susquehanna Corporation* (7th Cir. 1972) 461 F.2d 11 (securities fraud); *Cox v. C.H. Masland & Sons, Inc.* (5th Cir.1979) 607 F.2d 138 (fair representation action under § 301 of the Labor Management Relations Act (cited in *Pollock v. Castrovinci, supra* )).

**14.** Obviously, if the jury and we agree, the issue will be academic. We assume that if the jury finds for Blue Cross and we find for Security Plan, Blue Cross will not care to press its challenge to trial by jury.

breached the yearly written contracts by failing to pay Blue Cross the fees specified therein. We find that such relief is inappropriate on the record before us.

 Security Plan has proffered evidence that it signed the yearly written contracts only on personal assurances from Kelly and other Blue Cross officers that those contracts were mere formalities which Blue Cross was obligated to enter into but intended to ignore, and that the operation of the health care plan would actually conform instead to the alleged prior oral agreements.[15] Although we agree with Blue Cross that the written contracts are complete on their face,[16] and do not allow of modification by the terms of the oral agreements,[17] we reject Blue Cross's assertion that the Parol Evidence Rule bars consideration of Security Plan's evidence and contentions. Evidence of a party's reliance upon a collateral oral agreement and on its adversary's representation that such agreement would not be superseded by a subsequent written contract should be considered even where, as here, the written contract contains an integration clause; and the understanding of the other parties to the contract is a question to be resolved by the trier of fact. *Hellenic Lines Limited v. Gulf Oil Corporation* (2d Cir.1965) 340 F.2d 398, 401–402. In addition, Security Plan's defense of fraudulent inducement to sign the written contract is the sort of claim appropriately dealt with at trial, not on a motion for summary judgment.

We note, however, that Security Plan's claims do not appear to us to be particularly persuasive. The evidence proffered by it does not compel any finding other than that Blue Cross attempted to accommodate its wishes to the extent possible within the framework of the standard contract and the limitations set by the laws regulating insurance companies. Nor are we at all confident that Security Plan would be able to persuade the trier of fact that Livingston, a seasoned negotiator, and Levitt, who as Director of the Security Plan was experienced in the health plan field from the years when the Security Plan managed its own health coverage, really believed that Blue Cross would operate a plan covering over 30,000 individuals and their dependents on the strength of oral agreements and a series of letters; or, indeed, that Blue Cross would represent that it would thus operate. However, implausible though Security Plan's assertions may be, they are not without the realm of possibility. We are thus constrained to decline, on a motion for summary judgment, to decide what the true agreement between the parties was and which party, if either, has breached it.

### FRAUD

 .We are similarly compelled to deny Blue Cross's motion for summary judgment on Security Plan's allegations that Blue Cross fraudulently and falsely represented that it would provide various bene-

---

**15.** Security Plan Exhibit "R" (deposition testimony of Kelly to the effect that the limitation of Blue Cross's liability set forth in the written contracts was "a number which would never be reached" and was only an attempt to set forth, in the terms Blue Cross was required to use, the previously agreed-upon "cost-plus contract"); Security Plan Exhibit "E" (letter of Michael Lawless, Blue Cross's Manager for National Enrollment, stating that "the benefits [provided] will be exactly those currently administered by the 65 Security Plan").

**16.** Contrary to Security Plan's assertions, the contracts do contain the "price," *i.e.,* the fee to be paid by Security Plan to Blue Cross. This figure can be derived from the "composite rate" per plan member set out in the Application for

Group Hospital Service Contract, which is specifically incorporated into the contract. We further note that, since the written contract is a form contract commonly used by Blue Cross, it is highly unlikely that it would be deficient on its face in such a material matter.

**17.** Security Plan's attempts to reconcile the two agreements in this manner is belied not only by the written contract's integration clause but also by Security Plan's own contentions. As we understand Security Plan's description of the alleged oral agreements, they are meant to be complete in and of themselves, with coverage perhaps similar to that provided by the written contract but differing in several important ways. *See* letter of March 31, 1983 from counsel for Security Plan.

fits through its takeover of the health care plan.

Having reviewed these alleged representations, we think it likely that a full examination of the circumstances in which they were made will show that they were promissory in nature and referred to future events and were thus not representations on which a claim of fraud can be based. *See, e.g., Chase Manhattan Bank, N.A. v. Perla* (4th Dep't 1978) 65 A.D.2d 207, 411 N.Y.S.2d 66. We are also impressed by Blue Cross's argument that as officials with the experience and information gleaned from years in the business of health care insurance, Levitt and Livingston were in a position of knowledge and access to the facts equal to Blue Cross's, and thus are in no position to bring allegations of fraud. However, we decline here to make determinations which will be more appropriately made after a full trial.

## CONCLUSION

In summary, then, we find that we have jurisdiction over this action and we deny the motions for summary judgment on the subjects of conflict of interest, breach of contract, and fraud; and we further deny the motion to strike the demand for trial by jury of Security Plan's ERISA claims without prejudice to renewal after trial.

SO ORDERED.